# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Janet Nakalila Kitui,

**Civil No. 14-3480 (SRN/SER)**

Plaintiff,

v.

**REPORT AND RECOMMENDATION**

Entrust Datacard Corporation,

Defendant.

---

Janet Nakalila Kitui, Edina, Minnesota, *pro se*.

Melissa Raphan, Jessica R. Shiffman, and JoLynn M. Markison, Esqs., Dorsey & Whitney LLP, Minneapolis, Minnesota, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Entrust Datacard Corporation's ("Datacard") Motion for Summary Judgment [Doc. No. 52]. This motion was referred pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. (Order of Referral Dated Feb. 22, 2016) [Doc. No. 56]. For the reasons stated below, the Court recommends that Datacard's Motion for Summary Judgment be granted.

## I.    BACKGROUND

### A.    Factual Background[1]

Plaintiff Janet Nakalila Kitui ("Kitui") worked at Datacard from August 2010, until her termination on May 6, 2014. (Decl. of Curt Stockinger in Supp. of Mot. for Summ. J.,

---

[1]    The Court provides the factual background necessary to provide context for the motion now before it. The Court's background accounts for the fact that on a motion for summary judgment, the Court views the evidence in a light most favorable to the non-moving party.

"Stockinger Decl.") [Doc. No. 75 ¶¶ 2, 9];[2] *see also* (Compl.) [Doc. No. 1 ¶¶ 8–9]. Datacard is a private corporation that "offers products that produce the vast majority of financial cards around the world, a wide range of national and local identification cards and passports, and digital identity solutions that enable secure identification and transactions in a variety of devices." (Decl. of Mike Boucher in Supp. of Mot. for Summ. J., "Boucher Decl.") [Doc. No. 76 ¶ 2].[3] Kitui first worked for Datacard on a contract basis through a third-party staffing agency. (Stockinger Decl. ¶ 2); (Dep. of Janet Nakalila Kitui, "Kitui Dep.," Ex. A, Attached to Decl. of Melissa Raphan in Supp. of Mot. for Summ. J., "Raphan Decl.") [Doc. No. 74-1 at 14–15].[4] Kitui worked "in Datacard's supply chain department." (Stockinger Decl. ¶ 2). As a contract employee, Kitui's job responsibilities "were primarily following up on" purchase orders and "getting confirmation from . . . suppliers." (Kitui Dep. at 16).

In January 2012, Datacard had an opening for a buyer within its supply chain department. (Stockinger Decl. ¶ 3); (Decl. of Rebecca Jasper in Supp. of Mot. for Summ. J., "Jasper Decl.") [Doc. No. 77 ¶ 3]. Rebecca Jasper ("Jasper") encouraged Kitui to apply. (Jasper Decl. ¶ 3). Another Datacard employee also encouraged Kitui to apply; "[p]eople thought" she "would be a good buyer" and "wanted to work with" her. (Kitui Dep. at 20–21). Kitui applied and was interviewed for the position. (Stockinger Decl. ¶ 3); (Kitui Dep. at 16–17). "Datacard did not interview anyone other than . . . Kitui for th[e] position." (Stockinger Decl. ¶ 3). Kitui met with Jasper before she was hired, and Jasper told Kitui that she "liked working with" her and would

---

[2]    Curt Stockinger ("Stockinger") is a Datacard Human Resources Business Partner. (Stockinger Decl. ¶ 1).
[3]    Mike Boucher ("Boucher") is Vice President of Datacard's Global Supply Chain department. (Boucher Decl. ¶ 1).
[4]    The Court cites the deposition transcript pages assigned to the Kitui Deposition. All other page numbers cited in this Report and Recommendation refer to the page numbers assigned by CM/ECF.

like to have Kitui "on board permanently." (Kitui Dep. at 17–18). Jasper hired Kitui as a buyer. (Stockinger Decl. ¶ 4); (Kitui Dep. at 18, 22); *see also* (Letter from Datacard to Kitui Dated Jan. 9, 2012, Ex. 1, Attached to Jasper Decl.) [Doc. No. 77-1 at 2–3]; (Compl. ¶¶ 8–9).

In May 2013, Kitui received an "Excellence Everywhere" award from Datacard in recognition of her ability to understand customer needs, prioritize actions, collaborate with colleagues, and to do so with a positive attitude. (Awards, Ex. C in Opp'n to Mot. for Summ. J.) [Doc. No. 82 at 37]. Also in mid-2013, Kitui received an annual performance evaluation from Jasper addressing April 2012 through March 2013. *See* (Jasper Decl. ¶ 6) (Manager Evaluation, "2012/2013 Evaluation," Ex. 2, Attached to Jasper Decl.) [Doc. No. 77-1 at 5–9]; (Kitui Dep. at 63). In this annual evaluation, Jasper noted that Kitui made positive strides in her first year as a buyer, and Kitui was given an overall rating of "Achieving." *See* (2012/2013 Evaluation at 5, 7, 9). Nonetheless, Kitui underperformed "fairly consistent[ly]" with respect to "on time delivery." (*Id.* at 7); (Kitui Dep. at 63–70) (discussing performance during relevant time period and acknowledging that the 2012/2013 Evaluation contained "some positive comments," but that Jasper also identified areas she could "continue to improve and work on"); *see also* (Kitui Dep. at 69) (noting that the expectation for on time delivery was "97 percent" and that she was "still somewhat late" and "not yet where [she] need[ed] to be"). Jasper hoped Kitui's performance would improve. (Jasper Decl. ¶ 6). In spring 2013, Jasper reduced Kitui's workload "in an effort to help her succeed," but Jasper found that Kitui's performance did not improve. (*Id.* ¶ 7).

In October 2013, Jasper consulted Stockinger and Boucher regarding Kitui. (Stockinger Decl. ¶ 5); (Boucher Decl. ¶ 5). Jasper proposed placing Kitui on a performance improvement plan ("PIP"). (Email from Jasper to Stockinger, Ex. 3, Attached to Jasper Decl.) [Doc. No. 77-1 at 11] ("I am planning on putting Janet Kitui on a performance improvement plan at mid-year.

Please advise if you have input."). On October 30, 2013, Jasper sent Boucher and Stockinger a proposed PIP for Kitui. (Email from Jasper to Stockinger & Boucher, Ex. 4, Attached to Jasper Decl.) [Doc. No. 77-1 at 13–15]. The proposed PIP documents Jasper's "continue[d] concern about [Kitui's] performance" and failure to meet Datacard's expectations for its buyers. (*Id.* at 14). It also reflects specific performance issues, as well as Jasper's previous efforts to notify Kitui of some of these issues. (*Id.*). Jasper decided, however, to "hold off on the actual PIP for a couple months." (Email from Jasper to Stockinger & Boucher, Ex. 5, Attached to Jasper Decl.) [Doc. No. 77-1 at 17]. Jasper told Stockinger and Boucher that she had "been very specific on the issues," but had not "given her the talk yet" to convey that Kitui was in an "improve or else" situation. (*Id.*). In the interest of "fairness," Jasper wanted to "clarify the severity of" Kitui's situation before formally placing her on a PIP. (*Id.*).

In November 2013, Jasper met with Kitui for a mid-year evaluation. (Manager Evaluation, "2013 Mid-Year Evaluation," Ex. 6, Attached to Jasper Decl.) [Doc. No. 77-1 at 19–23]; (Jasper Decl. ¶ 10); (Kitui Dep. at 76). Kitui received an "Unsatisfactory" rating, and Jasper stated that Kitui failed "to complete the purchasing fundamentals as reported weekly" in Datacard's buyer metrics. (2013 Mid-Year Evaluation at 20–22). Jasper also stated: "Key internal departments . . . send email requests for follow up without your response. These departments finally copy me on the request before they may get a response from you. These are often 3[rd] and 4th requests. Your response time is well below expectations required for this position." (*Id.* at 21); *see also* (Email from Jasper to Stockinger & Boucher, Ex. 7, Attached to Jasper Decl.) [Doc. No. 77-1 at 25] (documenting and discussing Jasper's mid-year review with Kitui). When Jasper told Kitui in November 2013 that she was not meeting performance expectations, Kitui did not articulate any disagreement or argue with Jasper about whether her

performance was sufficient. (Kitui Dep. at 99–100). At the time of her deposition, however, Kitui stated that she did not agree with Jasper's assessment that her response time was below expectations and did not feel that certain standards articulated in the 2013 Mid-Year Evaluation were reasonable. (*Id.* at 91–92). Kitui did, however, express agreement with the general proposition that she needed to work on improving her customer-responsiveness. (*Id.* at 97–98).

By January 2014, Jasper felt that Kitui's performance had not improved. (Jasper Decl. ¶ 12). On January 22, 2014, Jasper sent an email to Boucher stating: "Even though I have been working with her weekly, I am not seeing the respective results in the metrics. She starts to fix some of them and then never gets them done." (Email from Jasper to Boucher, Ex. 8, Attached to Jasper Decl.) [Doc. No. 77-1 at 27].

In February 2014, Jasper decided to place Kitui on a PIP and sent Boucher and Stockinger a draft of the PIP for review. (Email from Jasper to Stockinger & Boucher, Ex. 9, Attached to Jasper Decl.) [Doc. No. 77-1 at 29–32]; (Boucher Decl. ¶ 7); (Stockinger Decl. ¶ 6). Jasper, Boucher, and Stockinger finalized the PIP and sent it to Datacard's legal department for review. (Boucher Decl. ¶ 7); (Stockinger Decl. ¶ 6). Jasper met with Kitui on February 14, 2014, to discuss Kitui's job performance. (Jasper Decl. ¶ 15); (Kitui Dep. at 102). According to Kitui, Jasper did not use the term "performance improvement plan," but Jasper "put [Kitui] on some notice" and told Kitui that she had "60 days to improve." (Kitui Dep. at 102–03). This "jolted" Kitui because "a week prior to that she had gone to . . . Stockinger" and requested her personnel file. (*Id.* at 103). Kitui asked Stockinger if he told Jasper that she requested her personnel file, and he told Kitui that he had not done so. (*Id.*). Jasper went on a business trip to China and planned to formally place Kitui on the PIP upon her return. (Jasper Decl. ¶ 14); (Boucher Decl. ¶ 7).

On February 25, 2014, an incident occurred between Kitui and her co-worker, Tammy Stenzel ("Stenzel"). (Stockinger Decl. ¶ 7); (Kitui Dep. at 48, 57–59, 142–61). Stenzel told Stockinger that "she had escalated" an order to "Jasper because she needed the issue resolved and was not getting a quick enough response from . . . Kitui." (*Id.*); *see also* (Emails, Exs. 12–13, Attached to Jasper Decl.) [Doc. No. 77-1 at 42–47]; (Emails, Ex. 14, Attached to Jasper Decl.) [Doc. No. 77-2 at 1–5]; (Jasper Decl. ¶ 17). Kitui confronted Stenzel about escalating the matter to Jasper, accused Stenzel of being racist, and called Stenzel a privileged white woman. (Stockinger Decl. ¶ 7); *see also* (Kitui Dep. at 57–59, 142–61) (discussing incident with Stenzel). During the course of events related to the confrontation between Kitui and Stenzel, Kitui learned that Jasper had previously instructed other Datacard employees to copy Jasper on their communications with Kitui.[5] (Kitui Dep. at 154–55).

Stockinger ultimately contacted Datacard's legal department regarding the confrontation between Kitui and Stenzel, and the legal department undertook an investigation. (Stockinger Decl. ¶¶ 7–8); *see also* (Kitui Dep. at 162). As part of this investigation, Kitui spoke with Datacard's general counsel. (Kitui Dep. at 56–60, 162). Datacard "concluded that . . . Stenzel's conduct was not racially motivated or discriminatory." (Stockinger Decl. ¶ 8).

Jasper met with Kitui on February 26, 2014—the day after the incident with Stenzel— and gave Kitui the PIP. (Jasper Decl. ¶ 21); (Stockinger Decl. ¶ 6). The PIP is dated February 25, 2014, and stated that Kitui's performance, as measured by Datacard's metrics, was "significantly below the standard for a majority of the specific buyer requirements" and that Kitui did not "demonstrate[] any noticeable improvement over the past 4 months." (Datacard Group PIP,

---

[5]     Jasper responded to Stenzel's emails and explained Kitui's actions with respect to the order at issue. (Kitui Dep. at 155–56). Kitui felt that while these emails gave the "appearance" that Jasper was standing up for her, Jasper was not doing so. (*Id.*).

"2014 PIP," Ex. 17, Attached to Jasper Decl.) [Doc. No. 77-2 at 12].[6] As to the "On Time in Full Delivery" metric, or "OTIF," Kitui's performance "remain[ed] under the required standard" while "the average for other buyers consistently exceed[ed] the standard." (*Id.*). The 2014 PIP stated that Kitui was also underperforming as to several other metrics and was "not successful in meeting the requirements and expectations of both . . . external suppliers and . . . internal customers." (*Id.* at 13). Specifically, Kitui's "lack of responsiveness . . . caused delay and frustration in areas that should be easily addressed, and . . . resulted in regular complaints." (*Id.*). The 2014 PIP also described Jasper's previous efforts to address Kitui's performance issues, including Kitui's 2013 Mid-Year Evaluation. (*Id.*). The 2014 PIP set forth specific performance requirements and informed Kitui that she would be on the PIP until April 22, 2014. (*Id.* at 14). Finally, the 2014 PIP informed Kitui that "[f]ailure to improve or correct the performance issues identified" therein would "result in additional disciplinary action, up to and including termination of employment." (*Id.*).

On March 4, 2014, Kitui signed and returned the 2014 PIP to Jasper. *See* (*id.*); *see also* (Jasper Decl. ¶ 22). In the employee comments section of the 2014 PIP, Kitui wrote: "I'm concerned with the timing of this disciplinary action. [I]t was insta[n]taneous following my registering [a] complaint of racial undertones with a colleague in the supply chain group. Secondly, a week earlier I requested my personnel file. These events sound like retaliation for exercising my rights. OTIF data is flawed." (2014 PIP at 14); *see also* (Kitui Dep. at 121) (stating that she disagreed with the information in the PIP because she believed the data was flawed). Jasper told Kitui that "the PIP was unrelated to the incident with . . . Stenzel," that

---

[6]      The 2014 PIP is also Exhibit A within the exhibits Kitui filed in opposition to the Motion for Summary Judgment. (Ex. A in Opp'n to Mot. for Summ. J.) [Doc. No. 82 at 1–4]. For ease of reference the Court cites only the copy of the 2014 PIP attached to the Jasper Declaration.

Jasper was "unaware [Kitui] had even requested her personnel file, and that the OTIF data, as reflected in the PIP, was accurate." (Jasper Decl. ¶ 22); *see also* (Coach Tracking Log, Ex. 18, Attached to Jasper Decl.) [Doc. No. 77-2 at 16].

After placing Kitui on the 2014 PIP, Jasper met with Kitui more regularly and determined that Kitui was still struggling to meet Datacard's performance standards.[7] *See* (Coach Tracking Log at 16–17) (documenting Jasper and Kitui's meetings during the PIP period); (Kitui Dep. at 101) (noting meetings with Jasper after imposition of the PIP). For instance, on March 19, 2014, Jasper noted that Kitui was still substantially underperforming as to one of her metrics, and the following week, she was substantially underperforming "in three different areas." (Coach Tracking Log at 16). At an April meeting, Kitui told Jasper that the metrics "were not correct." (*Id.* at 17). Jasper explained to Kitui how to manage "lates," and noted that this was "very common knowledge" that had been explained to Kitui "several times." (*Id.*). Jasper also noted repeated efforts to explain the metrics calculations to Kitui via email and that Kitui had previously "saved over a metrics document" in which her "metrics had changed." (*Id.*). Kitui felt that Jasper's meetings were not helpful during the PIP period, but that Jasper "wanted [her] to succeed." (Kitui Dep. at 123–24).

Jasper and Kitui exchanged several emails regarding Kitui's metrics, Kitui's allegations that the metrics data was incorrect, and Jasper's allegation that Kitui was improperly altering her metrics. For instance, on April 14, 2014, Jasper sent Kitui an email stating that as to the metrics for that week, Kitui's "expensed OTIF" was at "17%" but that when Jasper came in that morning "the expensed OTIF was at 79% and . . . had been saved over." (Email from Jasper to Kitui, Ex.

---

[7]    Kitui did receive a "customer excellence" award for the first quarter of fiscal year 2014. (Awards, Ex. C in Opp'n for Mot. for Summ. J. at 38). The record does not contain any evidence regarding the basis or criteria for this award.

20, Attached to Jasper Decl.) [Doc. No. 77-2 at 21]. Jasper concluded that Kitui changed the data "because the Excel spreadsheet on the network drive showed 'Kitui, Janet' as the person who had saved the changes." (Jasper Decl. ¶ 25). Jasper felt that making changes to the metrics "was not acceptable in general without approval, but was especially problematic because it was made during a PIP in which . . . Kitui's success or failure was based in part on improvement in this and other metrics." (*Id.* ¶ 26). On that same day, Jasper told Kitui that she did "not have permission to change th[e] data." (Email from Jasper to Kitui, Ex. 21, Attached to Jasper Decl.) [Doc. No. 77-2 at 25]. Kitui stated that she "did not change the data" and "only filtered" it for her name. (*Id.*); *see also* (Kitui Dep. at 39) (testifying that she "did not change the metrics"); (Emails, Ex. B in Opp'n to Mot. for Summ. J.) [Doc. No. 82 at 6–35] (emails among Jasper, Kitui, and other buyers and between Jasper and Kitui relating to correction and integrity of metrics).

Jasper subsequently reviewed Kitui's metrics more closely and discovered that the number of "manual overrides" for the April 21, 2014 metrics report "was significantly higher" than the manual overrides "for any of the metrics reports in the previous six months."[8] (Jasper Decl. ¶ 31); *see also* (Ex. 23, Attached to Jasper Decl.) [Doc. No. 77-2 at 32–44] (including system data regarding manual overrides). Kitui was not permitted to perform manual overrides because she was on a PIP and was instead supposed to contact Jasper who "would then change the data if . . . Kitui could provide documentation to support the change." (Jasper Decl. ¶ 29). In an email dated May 2, 2014, however, Kitui stated that she "changed the late report either because [the] Supplier contacted [her] stating they moved the date out . . . or they never received the" purchase order. (Ex. 24, Attached to Jasper Decl.) [Doc. No. 77-2 at 46–47]. Jasper

---

[8]     A manual override occurs when a buyer changes a purchase order flagged as "late" to "on time" because the purchase order was late "for some reason not attributable to the buyer." (Jasper Decl. ¶¶ 28, 30).

responded stating, "Ok, please send me the emails—I need to get copied on all the supplier requests . . . ." (*Id.*).

In addition to ongoing issues with Kitui's metrics, Jasper found that Kitui failed to address concerns about her responsiveness to emails and phone calls. (Jasper Decl. ¶ 24). For example, at the time of her termination, Kitui had 1,439 unread emails. (Ex. 19, Attached to Jasper Decl.) [Doc. No. 77-2 at 19]. In March 2014, Kitui had a conversation with Boucher. (Kitui Dep. at 49). Boucher told Kitui that "hearts are broken here because you've accused us of racism" and told Kitui that she should have been placed on a PIP in November 2013. (*Id.*).

Datacard terminated Kitui's employment following the end of the PIP period, effective May 6, 2014. (Boucher Decl. ¶ 8); (Stockinger Decl. ¶ 9). On May 14, 2014, Jasper sent a letter to Kitui in response to an email Kitui sent to Stockinger. (Termination Letter, Ex. 26, Attached to Jasper Decl.) [Doc. No. 77-2 at 56]. In her email, Kitui requested her personnel file and "a written explanation" regarding her termination. *See* (*id.*). Jasper's responsive letter stated

> Your employment was terminated because you did not meet the general requirements of your position. This was most recently specifically documented in your failure to achieve the metrics and other requirements in your Performance Improvement Plan. In addition to this, you manipulated the system for reporting your performance against these metrics so that it appeared your performance was better than it actually was.

(*Id.*).

On June 3, 2014, Kitui filed a charge of discrimination with the Minnesota Department of Human Rights and the Equal Opportunity Employment Commission ("EEOC"). (Charge of Discrimination, Ex. B, Attached to Raphan Decl.) [Doc. No. 74-2]. The EEOC issued a dismissal and notice of right to sue on June 18, 2014. (Dismissal & Notice of Rights, Ex. C, Attached to Raphan Decl.) [Doc. No. 74-3].

### B.     Procedural Background

Kitui filed this employment discrimination action on September 17, 2014. (Compl.). In her Complaint, Kitui asserts the following claims: In Count 1, Kitui asserts that Datacard subjected her to race discrimination and harassment in violation of Title VII, and in Count 2, Kitui asserts that she was subjected to "retaliation for opposing race discrimination," also in violation of Title VII.[9] (Compl. ¶¶ 13–21).

Datacard answered the Complaint on April 13, 2015. (Answer to Compl.) [Doc. No. 17]. The Court issued a pretrial scheduling order on June 10, 2015. (Pretrial Scheduling Order) [Doc. No. 30]. Kitui failed to respond to Datacard's discovery requests, which led to motion practice and an extension of the pretrial scheduling order. (Datacard's Mot. to Compel Disc.) [Doc. No. 32]; (Datacard's Mem. of Law in Supp. of Mot. to Compel Disc.) [Doc. No. 36 at 1–2]; (Order Dated Oct. 28, 2015) [Doc. No. 43]; (Order Regarding Pretrial Scheduling Order Extensions) [Doc. No. 46].

Datacard filed this Motion for Summary Judgment on February 19, 2016. On March 2, 2016, Kitui filed a motion to amend her complaint, which was untimely under this Court's pretrial scheduling order. (Pl.'s Mot. to Amend the Compl. to Add State Law Cause of Action for Defamation and Request for Punitive Damages, "Mot. to Amend") [Doc. No. 57]. At a hearing, the Court denied the Motion to Amend and denied Kitui's oral motion to reopen discovery.[10] (Minute Entry Dated Mar. 16, 2016) [Doc. No. 71].

After briefing by the parties, the Court held a hearing on Datacard's Motion for Summary Judgment on May 20, 2016. (Minute Entry Dated May 20, 2016) [Doc. No. 90]. The Court again

---

[9]     Count 2 of Kitiui's Complaint is titled "Sex Discrimination in Violation of Title VII," but the allegations thereunder address only retaliation based on Kitui's opposition to race discrimination. *See* (Compl. ¶¶ 17–21).

[10]    The Honorable Susan Richard Nelson later affirmed this Court's order denying the Motion to Amend over Kitui's objections. (Order Dated May 10, 2016) [Doc. No. 89].

denied an oral motion by Kitui to reopen discovery. (*Id.*). Kitui made an oral motion to strike certain exhibits submitted by Datacard, which the Court informed the parties it would consider along with the Motion for Summary Judgment. (*Id.*). Further, the Court permitted Kitui to submit additional information to the Court by May 23, 2016, and took the Motion for Summary Judgment under advisement on that date. (*Id.*).

## II.   DISCUSSION

### A.   Legal Standard

#### 1.   Summary Judgment Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248. A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* On a motion for summary judgment, this Court views the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* But the party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

"A mere scintilla of evidence is insufficient to defeat summary judgment . . . ." *Pederson v. Bio-Medical Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015). It is also insufficient for a party opposing summary judgment to rely on her own unsubstantiated allegations. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012) (granting summary judgment on race discrimination claim when plaintiff did not present "any evidence, other than her own allegations" to demonstrate that written warnings from her employer "were not based in fact"); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) ("While evidence supporting this claim would be highly relevant to the issue of pretext, plaintiff presented no such evidence other than his own unsubstantiated allegations in deposition.").

## 2.      Relevant Employment Discrimination Standards

Kitui's Complaint alleges claims of race discrimination and retaliation. A party alleging race discrimination under Title VII may avoid summary judgment "in one of two ways." *Gibson*, 670 F.3d at 853. Specifically, Kitui "may either 'present admissible evidence directly indicating unlawful discrimination,' or alternatively, [she may] create 'an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp.*'" *Id.* (quoting *Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009)).

"To prove intentional discrimination through direct proof, a plaintiff must establish a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Id.* (internal quotation marks omitted). In order to create an inference of unlawful discrimination under the *McDonnell Douglas* framework, a plaintiff must first make a prima facie case of discrimination. *Id.* "[A] plaintiff must establish a prima facie case by demonstrating (1) that [she] is a member of a racial minority, (2) that [she] was qualified for the

relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation." *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003).

"If the plaintiff makes this prima facie showing, the defendant[] must meet a burden of production in the second step to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If a defendant satisfies this second step, "the burden returns to the plaintiff in the third step to prove that the defendant['s] proffered reason is raised merely as a pretext for discrimination." *Id.* "Within this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Similarly, when there is no direct evidence of retaliation, courts apply a *McDonnell Douglas* analysis to a plaintiff's retaliation claim. *Gibson*, 670 F.3d at 856. A plaintiff must first establish a prima facie case of retaliation by showing that she (1) "engaged in protected activity"; (2) "suffered a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination"; and (3) "there is a causal connection between the protected activity and the adverse action." *Id.* "[I]f the plaintiff puts forth a prima facie case, the employer may rebut the resulting presumption of discrimination by articulating a legitimate, non-retaliatory reason for the adverse employment action. Finally, if the employer proffers a race-neutral rationale, the plaintiff may attempt to refute the asserted reason as mere pretext." *Id.* at 856–57 (alteration in original) (internal quotation marks omitted).

Finally, Kitui asserts a racial harassment claim. To prevail on a racial harassment hostile work environment claim, a plaintiff must prove that: (1) she was a member of a protected group;

(2) she "was the target of severe or pervasive harassment on account of [her] race"; (3) "the harassment affected a term, condition, or privilege of [her] employment"; and (4) her employer "knew or should have known of the racial harassment and failed to take adequate remedial measures." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002). "This standard is relatively stringent." *Id.* "'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

**B.     Analysis**

Datacard argues that summary judgment is appropriate as to all of Kitui's claims. (Datacard's Mem. of Law in Supp. of Mot. for Summ. J., "Mem. in Supp.") [Doc. No. 73]. With respect to Kitui's race discrimination claim, Datacard argues that Kitui presented no direct evidence of race discrimination and that under the *McDonnell Douglas* burden shifting framework, Kitui cannot establish a prima facie case of discrimination. (*Id.* at 22–26). Furthermore, Datacard argues that even if Kitui could establish a prima facie case of discrimination, "Datacard terminated [Kitui] for legitimate, nondiscriminatory reasons" and Kitui cannot demonstrate pretext. (*Id.* at 26–27). Datacard also argues that Kitui cannot establish a claim of racial harassment. (*Id.* at 27–30). Finally, Datacard argues that Kitui cannot establish a prima facie case of retaliation and that, even if she could, it terminated Kitui's employment for permissible, non-retaliatory reasons, and Kitui cannot establish pretext. (*Id.* at 31–34).

Kitui filed a response to Datacard's Motion for Summary Judgment. (Pl.'s Opp'n to Mot. for Summ. J., "Mem. in Opp'n") [Doc. No. 81]. The majority of Kitui's opposition recites various legal standards, with little analysis. Nonetheless, liberally construing Kitui's opposition,

the Court understands Kitui's arguments to be that she has offered direct evidence of discrimination, that she has established a prima facie case of racial discrimination and retaliation, that Datacard has failed to provide a legitimate, non-discriminatory reason for her termination, and that "there is no way for the court, or anyone else, to independently verify" that her termination was not based on pretext. (*Id.* at 4–11). Kitui submitted several exhibits and her own declaration in opposition to the Motion for Summary Judgment.[11] (Emails, Ex. B in Opp'n to Mot. for Summ. J.); (Awards, Ex. C in Opp'n to Mot. for Summ. J.); (Decl. of Janet Nakalila Kitui in Opp'n to Mot. for Summ. J., "Kitui Decl.") [Doc. No. 83].[12]

### 1.    Racial Discrimination Claim

#### a.    Direct Evidence

---

[11]     Kitui states in the opening paragraph of her memorandum that "Defendant . . . very clearly defamed Plaintiff in a termination letter." (Mem. in Opp'n at 1). Kitui's Complaint does not assert a defamation claim, and this Court denied Kitui's Motion to Amend seeking to add this claim. (Text Only Entry Dated Mar. 16, 2016) [Doc. No. 72]. Kitui may not now revive her attempt to litigate this claim in opposition to Datacard's Motion for Summary Judgment.

Elsewhere in her brief, Kitui states that a "'district court [may] abuse[] its discretion if the movant diligently pursued its previous discovery opportunities and, if the movant can show how allowing additional discovery would have precluded summary judgment.'" (Mem. in Opp'n at 11–12) (quoting *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994)). Presumably, Kitui is attempting to invoke Rule 56(d), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" defer consideration of or deny a motion for summary judgment, allow the non-movant "time to obtain affidavits or declarations or to take discovery," or "issue any other appropriate order." Kitui cites relevant law, but does not argue that she has made a showing required to justify any form of relief contemplated under Rule 56(d). Instead she states that she "conducted no discovery." (Mem. in Opp'n at 11–12). The Court finds no basis to take any action under Rule 56(d).

[12]     The Kitui Declaration contains two declarations from Kitui that are separately titled and numbered. Because the documents were filed together on CM/ECF, the Court refers to them collectively and identifies the paragraph numbers in the first of the two documents using the letter "a"; for example, paragraph 1 in the first document is identified as paragraph 1a. The Court uses only the assigned numbers to refer to the paragraphs in the second document; for example, paragraph 1 in the second document is simply identified as paragraph 1.

Direct evidence is, "evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). For example, direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments made during the decisional process that reflect a discriminatory animus, or comments uttered by individuals closely involved in employment decisions. *See Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991). But direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007) (internal quotation marks omitted).[13]

Datacard states that Kitui "has no direct evidence of race discrimination." (Mem. in Supp. at 22). Kitui argues, however, that she has presented direct evidence of race discrimination, which is "set forth in" certain paragraphs of her own declaration. (Mem. in Opp'n at 6–7) (citing paragraphs 9, 43–45, 58, 65–66, 78–84, and 88 of the Kitui Declaration). The Court concludes that none of the paragraphs referred to constitute direct evidence.

---

[13] To the extent Kitui urges the Court to adopt legal standards regarding direct evidence from other circuit courts of appeals that Kitui believes are "more sensible," this Court cannot do so, as it is bound to apply the controlling law of the Eighth Circuit. *See* (Mem. in Opp'n at 3–4). Moreover, the out-of-circuit standards regarding direct evidence that Kitui cites to do not appear to differ meaningfully from Eighth Circuit precedent, nor does it appear that reliance on such standards would benefit Kitui in any way or lead to a different result than that reached under Eighth Circuit law. *See* (*id.*).

Likewise, Kitui's general assertion that it may be difficult for courts to discern what evidence is "direct evidence" does not warrant a departure from the above legal standards articulated by the Eighth Circuit, and, for reasons described below, this case does not present a close or difficult question regarding whether Kitui has presented direct evidence of discrimination. *Cf.* (Mem. in Opp'n at 3).

In paragraph 9 of her declaration Kitui states, "I am the only black buyer and always perceived that the Planning Team treated me with less respect than it treated the other buyers." In paragraphs 43–45, Kitui discusses an incident relating to an email she sent to Dan Bye ("Bye") in July 2013 about a "computer program" that "was not designed to document returns in the way that was sought." *See* (Kitui Decl. ¶¶ 42–44). According to Kitui, Bye "did not take [her] explanation kindly" and forwarded the email to his manager. (*Id.* ¶ 43). The email was ultimately forwarded to "Boucher who in turn forwarded it to . . . Jasper and instructed her to talk to" Kitui. (*Id.*). Kitui states that she "asked [Jasper] what was wrong with [her] email," but Jasper did not provide Kitui with an answer and told her not to "reply directly" to Boucher. (*Id.* ¶¶ 44–45). In paragraph 58, Kitui refers to her confrontation with Stenzel. She states that part of Stenzel's "response indicated that [Stenzel] expected [Kitui] not only to place the orders, but also to serve as a stock clerk, taking some responsibility for the whereabouts of [a] part." (*Id.* ¶ 58).

 In paragraph 65, Kitui again states that she was the "only black purchaser at Datacard," and in paragraph 66, Kitui states that she observed Boucher "interact in a very sociable way with other purchasers," but that he was not friendly to her. In paragraphs 78–84, Kitui describes her March conversation with Boucher, which Kitui initiated when she felt others at Datacard were "talking about [her] after the incident with [Stenzel]." *See* (*id.* ¶¶ 66, 75–76, 78–84). Specifically, Kitui states: (1) Boucher's "demeanor was one of controlled anger"; (2) he did not "make a single friendly or sociable remark"; (3) she "would characterize him as hostile or unfriendly"; (4) he "knew nothing about [Kitui] apart from the color of [her] skin"; (5) he was "somewhat tense" and "defensive"; and (6) he "drew a bigoted conclusion that the problem must be [Kitui]." (*Id.* ¶¶ 78–80, 82–84). Further, Kitui asserts that Boucher told her it was "the first time" he had "ever been accused of being racist." (*Id.* ¶ 80). Kitui "hadn't accused him of being

racist," so she "believe[s] that he inadvertently demonstrated the characterization was apt by assuming that [she] made such an accusation." (*Id.* ¶¶ 80–81). Kitui also asserts that she asked Boucher questions regarding why she had not been placed on a PIP earlier and about whether Datacard believed PIPs help employees "achieve" and "obtain better job security." (*Id.* ¶ 82). Kitui states that she and Boucher "did not have any discussion that would have helped him understand" her conversation with Stenzel and that he "could not know what happened." (*Id.* ¶¶ 83–84). Finally, in paragraph 88, Kitui states, "On May 10[,] 2014[,] I received a letter from Rebecca falsely accusing me of 'manipulating' data, though Rebecca had told me to find a new job long before I was actually terminated."

None of the above qualifies as direct evidence of discrimination. The content that Kitui cites to is far from the type of strong evidence of discriminatory motive that courts consider direct evidence. *Wagner v. Gallup, Inc.*, 989 F. Supp. 2d 782, 788 (D. Minn. 2013) (Ericksen, J.) (noting that the concept of direct evidence refers to "'the causal strength of the proof'" (quoting *Griffiths*, 387 F.3d at 736)). Kitui presents allegations regarding events that transpired during her employment with Datacard, but "[t]he various pieces of evidence to which [Kitui] points to would require so many inferential leaps to get to a conclusion that discriminatory animus motivated" any adverse employment action "that they simply cannot qualify as direct evidence." *See id.* (noting that courts have found direct evidence of discriminatory motive when "a statement or policy is discriminatory on its face"); *see also Ramlet*, 507 F.3d at 1153 (concluding statements were not direct evidence in age discrimination case when "an inference [was] required to connect the statements" to the plaintiff). In addition, to the extent Kitui refers to statements or actions by the "Planning Team," Bye, or Stenzel, there is nothing in the record to suggest that this conduct was related to a decisional process regarding Kitui's employment or

that the conduct was committed by employees involved in the decision-making process. *See Ramlet*, 507 F.3d at 1153.

Finally, to the extent Kitui relies on her own inferences of discriminatory animus and her own unsubstantiated allegations and offers them as direct evidence through her declaration, she cannot establish direct evidence of discrimination, nor can she create a genuine issue of material fact. Indeed, considering Kitui's own inferences as direct evidence is contrary to the very notion of direct evidence. *See Beshears*, 930 F.2d at 1354 (noting that "direct evidence may include evidence of actions or remarks **of the employer** that reflect a discriminatory attitude" (emphasis added)); *Ramlet*, 507 F.3d at 1152–53 (noting that direct evidence must provide a specific link between the discriminatory motive and the challenged employment decision, rather than a more inferential connection). Moreover, as the Eighth Circuit noted in *Gibson* and *Davenport*, it is insufficient for a plaintiff to rely on unsubstantiated allegations in opposing a motion for summary judgment. *See Gibson*, 670 F.3d at 855 (noting insufficiency of plaintiff's own allegations); *Davenport*, 30 F.3d at 945 (noting plaintiff's "failure to adduce any independent evidence to substantiate" his discrimination claim); *see also Loving v. Roy*, No. 12-cv-551 (SRN/LIB), 2013 WL 4734017, at *5 (D. Minn. Sept. 3, 2013) (Nelson, J. adopting report and recommendation of Brisbois, Mag. J.) (concluding that plaintiff's "evidence, in the form of allegations made" in his own declaration and prior grievances "consist[ed] entirely of [his] own self-serving statements" and that such "bare allegations" were insufficient to permit plaintiff's "claims to survive a motion for summary judgment").

For the foregoing reasons, the Court concludes there is no direct evidence of race discrimination.[14] This Court will therefore analyze Kitui's claim under the *McDonnell Douglas* burden-shifting framework.

### b.     *McDonnell Douglas* Analysis

Ordinarily, Kitui must establish a prima facie case—that is, "(1) that [she] is a member of a racial minority, (2) that [she] was qualified for the relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation." *Hannoon*, 324 F.3d at 1046. The Court assumes, however, for the purpose of Datacard's motion, that Kitui established a prima facie case and moves to the next stage of the *McDonnell Douglas* analysis. *See Smith v. United Parcel Serv.*, — F.3d —, 2016 WL 3726032, at *3 (8th Cir. July 12, 2016) ("We presume for purposes of analysis that [Plaintiff] has satisfied [the prima facie case] requirement."); *Gibson*, 670 F.3d at 854 (assuming that plaintiffs established a prima facie case of race discrimination and affirming grant of summary judgment because there was insufficient evidence that employer's actions were pretext for discrimination).[15]

### i.     Legitimate, Nondiscriminatory Reason

---

[14]     The Court therefore does not separately address Kitui's argument that "virtually any direct evidence precludes summary judgment by [an] employer." (Mem. in Opp'n at 4).

[15]     Kitui appears to suggest that such analysis—that is, assuming that she has established a prima facie case and proceeding to the latter stages of the *McDonnell Douglas* analysis, is inappropriate in the context of a motion for summary judgment. *See* (Mem. in Opp'n at 11) (arguing that once a plaintiff "has made [a] prima facie case, there is little point to considering the Defendant's response in the context of a summary judgment motion" because "[t]he same evidence that establishes a prima facie case should be, on summary judgment, sufficient to rebut any proffered excuse for . . . discrimination" and because "weighing [her] prima facie evidence against rebuttal evidence" involves making factual determinations that are "impermissible" in the context of summary judgment). Kitui cites no controlling authority in support of her argument, and Eighth Circuit jurisprudence is to the contrary. *See, e.g.*, *Smith*, 2016 WL 3726032, at *3–4; *Gibson*, 670 F.3d at 854.

Because the Court assumes Kitui established a prima facie case, the Court must next consider whether Datacard has satisfied its burden of articulating a legitimate, non-discriminatory reason for Kitui's termination.[16] *See Hannoon*, 324 F.3d at 1046. The Court concludes that Datacard has done so.

Kitui was terminated because she was not meeting Datacard's performance metrics, did not achieve other requirements in the 2014 PIP, and manipulated the system for reporting metrics. (Termination Letter); (Jasper Decl. ¶ 34); (2014 PIP); (Coach Tracking Log). Poor job

---

[16]    It is not entirely clear what alleged adverse employment action Kitui intends to rely on. The Court concludes, however, that the only adverse employment action properly presented here is Kitui's termination. "The Eighth Circuit has stated that not everything that makes an employee unhappy is an actionable adverse employment action." *Tademe v. St. Cloud State Univ.*, No. Civ. 00-1725 (DSD/JMM), 2001 WL 1584593, at *9 (D. Minn. Dec. 10, 2001) (Doty, J.). "Rather, according to the Eighth Circuit, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits or responsibilities." *Id.* That is, "'[p]roof of an adverse employment action requires a tangible change in duties or working conditions that constitute a material disadvantage.'" *Id.* (quoting *Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001)). Arguably, Kitui intends to assert that (1) her placement on a PIP, (2) Datacard's delay in placing her on a PIP, and (3) her termination are all adverse employment actions. *See* (Kitui Dep. at 47, 54–55, 58, 61). While Kitui's termination is an adverse employment action, the Court cannot conclude that Datacard's delay in placing Kitui on a PIP comes within the scope of the Eighth Circuit's definition of an adverse employment action. Datacard's decision to wait to put Kitui on a PIP did not result in a material employment disadvantage—in fact, it gave Kitui more time and opportunity to perform her job proficiently, and there is nothing in the record to suggest that the delay in placing Kitui on a PIP had any bearing on the time she had to improve her performance once on the PIP.
    As to Kitui's placement on a PIP, the Eighth Circuit has stated that "placement on [a] PIP alone does constitute an adverse employment action." *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014); *see also Bailey v. Seagate Tech., LLC*, No. Civ. 04-1399 (RHK/JSM), 2005 WL 1869108, at *7 n.10 (D. Minn. Aug. 5, 2005) (Kyle, J.) (noting that plaintiff "advance[d] a wide-range of alleged adverse employment actions," including being placed on a PIP, and concluding that only plaintiff's "replacement performance evaluation and . . . termination" constituted adverse employment actions). The Court therefore concludes that Kitui's placement on a PIP is not by itself an adverse employment action. Even if it were, however, the same legitimate, non-discriminatory reasons articulated by Datacard as discussed below would satisfy Datacard's burden and shift the burden to Kitui to demonstrate pretext, which she has failed to do. *See infra* Part III.B.1.b.ii. Finally, given the record before the Court, to the extent Kitui intends to rely on any other events or circumstances as adverse employment actions, her "workplace grievances do not rise to the level of adverse employment actions." *See Bailey*, 2005 WL 1869108, at *7 n.10.

performance and employee misconduct are legitimate, non-discriminatory bases for Kitui's termination. *See Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016) (finding a legitimate, non-discriminatory reason for plaintiff's termination when employer relied on another employee's account of plaintiff's misconduct); *Hannoon*, 324 F.3d at 1047 ("[D]efendants easily meet their burden of production by alleging poor performance as a legitimate basis . . . for [plaintiff's] termination."); *Bailey*, 2005 WL 1869108, at *7 (stating that "[d]eficient performance" is a legitimate, nondiscriminatory reason for an adverse employment action).

Kitui argues that Datacard has not put forth a legitimate, non-discriminatory reason for her termination. Specifically, Kitui seems to argue that Datacard has not provided sufficient detail regarding her failure to meet Datacard's performance standards and Datacard's subsequent actions. *See* (Mem. in Opp'n at 4–6). Relatedly, Kitui appears to contend that the lack of detail deprives this Court of the information it needs "to evaluate [her] performance, and amounts to a careless or knowing[] improper use of data to mask subjective beliefs." (*Id.* at 6). Kitui also suggests that Datacard failed to provide a legitimate, non-discriminatory reason for her termination because Datacard's preferred description of her job duties as a buyer is incomplete and/or inaccurate and because "any reasonably detailed description of her responsibilities and performance compels the conclusion that her performance was beyond satisfactory."[17] *See* (*id.* at 4–5).

---

[17] In the section of her memorandum addressing Datacard's "explanation for" her termination, Kitui states that Jasper's allegation that Kitui was manipulating performance metrics "seeks to pass off a bigoted and inaccurate conclusion as a discovery." (*Id.* at 6). This argument, however, appears to relate more to the question of pretext, and the Court will therefore discuss the argument in that context. *See infra.*

As to Kitui's argument that Datacard has not provided sufficient detail regarding her poor job performance, the Court is unpersuaded. Datacard proffered substantial detail about Kitui's job performance. In contending that Datacard's submissions lack sufficient detail, Kitui cites only to the Boucher Declaration, ignoring Datacard's submission of significant other evidence that thoroughly documents and explains Datacard's concerns regarding Kitui's failure to satisfy various performance standards and other requirements. *See, e.g.*, (Exs. 3–5, 7–9, Attached to Jasper Decl.); (2013 Mid-Year Evaluation); (2014 PIP); (Coach Tracking Log). Datacard satisfied its burden to articulate a legitimate, non-discriminatory reason for Kitui's termination. *See Hannoon*, 324 F.3d at 1047 (noting that burden to articulate legitimate, non-discriminatory reason for adverse employment action is "merely one of production and not of proof").

With regard to Kitui's arguments that the Court lacks sufficient information to evaluate her performance and that her performance was satisfactory, Kitui misapprehends the scope of the Court's inquiry under the *McDonnell Douglas*. When "an employer articulates reasons for its actions not forbidden by law, it is not the Court's province to decide whether those reasons were wise, fair, or even correct, so long as they truly were the reasons for its actions." *Bailey*, 2005 WL 1869108, at *8 (citing *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)); *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994) (noting that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions"); *VanDyke v. City of Minneapolis*, Civil No. 14-224 (SRN/SER), 2016 WL 3360484, at *4 (D. Minn. June 16, 2016) (Nelson, J.) (rejecting plaintiff's challenges to defendant's legitimate, non-discriminatory reason for plaintiff's termination because under the *McDonnell Douglas* framework, "the Court is concerned solely with whether the employer's proffered reason for

termination was the true reason for termination," not with whether the reason was fair or correct).

Finally, to the extent Kitui contends that Datacard failed to demonstrate a legitimate non-discriminatory reason for her termination because Datacard has not accurately described her job duties, her argument is without merit. *See* (Mem. in Opp'n at 4–5). As a general matter, it is not clear to the Court that Datacard's description of Kitui's job duties in its submissions to the Court bears in any manner on whether Datacard satisfied its burden to articulate a legitimate, non-discriminatory reason for Kitui's termination. Assuming that it does, however, Kitui's argument is unavailing. Kitui does not explain what aspects of her job duties Datacard has failed to account for in its submissions, and only states that Datacard has provided "senseless redundant jargon." (*Id.* at 5) (citing Boucher Decl.). But Boucher's description of Kitui's job duties is nearly identical to Kitui's testimonial description of her job duties. *See* (Boucher Decl. ¶ 4); (Kitui Dep. at 22). To the extent Kitui seeks to expand upon her description of her job duties in her declaration, nothing alleged therein alters the fact that Datacard satisfied its burden to articulate a legitimate, non-discriminatory reason for her termination. *See, e.g.*, (Kitui Decl. ¶¶ 6–8).[18]

Datacard offered evidence that it terminated Kitui due to her poor job performance and misconduct in changing her metrics, and therefore Datacard carried its burden under the *McDonnell Douglas* framework. This shifts the burden back to Kitui to demonstrate that Datacard's proffered reason was pretext for discrimination.

---

[18]    To the extent Kitui's argument is that Datacard's explanation for her termination is not legitimate and non-discriminatory because it was unfair to terminate her for failing to meet certain performance requirements when satisfaction of those requirements was not entirely within her control, her argument also fails. *See Edmund v. Midamerican Energy Co.*, 299 F.3d 679, 685–86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations . . . or even unsound business practices."); (Kitui Decl. ¶¶ 7, 10, 20–21, 54); *see also VanDyke*, 2016 WL 3360484, at *4.

### ii.        Pretext for Discrimination

"To survive summary judgment," Kitui "must now demonstrate that a genuine issue remains as to whether [Datacard's] purported legitimate reason for termination is pretextual." *See Smith*, 2016 WL 3726032, at *3. The Eight Circuit provides

> that there are at least two routes for demonstrating a material question of fact as to pretext. First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact. Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer.

*Gibson*, 670 F.3d at 854 (citations and internal quotation marks omitted). A plaintiff may demonstrate pretext, "among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Id.* (internal quotation marks omitted). Kitui "must do more than merely discredit [Datacard's] asserted reasoning for the employment action." *See Wagner*, 989 F. Supp. 2d at 790. She must "'also demonstrate that the circumstances permit a reasonable inference of discriminatory animus.'" *Id.* (quoting *Gibson*, 670 F.3d at 856).

Kitui's arguments regarding pretext are not clear. Liberally construing Kitui's submissions, however, the thrust of her argument appears to be that there are genuine issues of material fact about whether her performance was in fact deficient, whether Datacard's metrics were flawed, and whether she manipulated her metrics or whether it was Jasper that did so. *See* (Mem. in Opp'n at 5–6, 10) (asserting that Jasper's allegation that Kitui was manipulating performance metrics "seeks to pass off a bigoted and inaccurate conclusion as a discovery" and stating that Datacard "resort[ed] to a baseless accusation" for terminating Kitui); *see also* (Kitui Dep. at 89) (alleging that "someone at Datacard was purposely changing [her] metrics to make [her] performance look worse than . . . it was"). Although Kitui cites to certain paragraphs of her declaration in her memorandum and does so in the context of arguing that she has offered direct

evidence of discrimination, she arguably offers her declaration to demonstrate genuine issues of material fact as to pretext. *See generally* (Kitui Decl.); *but see* Fed. R. Civ. P. 56(c)(3) (noting that a "court need consider only the cited materials"). The Court concludes that Kitui has failed to present sufficient evidence to create a genuine issue of material fact that Datacard's articulated reason for her termination was pretextual.

First, to the extent Kitui relies on her previous awards from Datacard to demonstrate that her performance not truly deficient and that Datacard's termination of her employment was therefore pretextual, the Court is not persuaded. *See* (Awards, Ex. C in Opp'n to Mot. for Summ. J.). Two out of the three awards Kitui submitted are from June 2012 and May 2013 respectively, well before October 2013, when Jasper first contemplated placing Kitui on a PIP.[19] *See* (*id.*). Given the subsequent consistent and contemporaneous documentation demonstrating Datacard's ongoing concerns with Kitui's performance, no reasonable jury could find that Kitui's receipt of a single performance award in 2014 demonstrates that Datacard's overall documented and expressed dissatisfaction with Kitui's job performance was pretextual.

Second, the various email exchanges Kitui appears to rely on to show that she was not manipulating her metrics and that Jasper was doing so do not create a genuine issue for trial. (Emails, Ex. B in Opp'n to Mot. for Summ. J.). These emails reflect that Kitui previously questioned the integrity of the metrics, asked Jasper about this, and received various explanations regarding changes to the metrics. Specifically, the emails demonstrate that a Datacard employee identified an issue with certain metrics on April 9, 2014, and informed others, including Kitui and Jasper, of the issue. On April 10, 2014, Jasper sent an email to Kitui and others explaining that certain purchase orders had been "marked . . . not late" that day. (*Id.* at 10). Jasper stated that

---

[19]     Kitui received the third award in 2014. (Awards, Ex. C in Opp'n for Mot. for Summ. J. at 38).

she "had been deleting these manually off the metrics—but thought we would just fix these for good." (*Id.*). On April 11, 2014, Kitui sent Jasper an email "express[ing] concern regarding the data integrity that is being used to calculate the metrics." (*Id.* at 25). Jasper responded the same day, explaining the way in which she determined Kitui's metrics and telling Kitui to "respond back if" her explanation was "still not clear." (*Id.* at 21–22).

On April 13, 2014, Kitui again emailed Jasper stating, "Data from week 4/7/2014 is flawed[.] [I]t captured supplier[s] that are not mine and dates go back to 2011?" (*Id.* at 12). Jasper responded stating,

> Yes, you have received several emails about this, in the previous weeks I deleted these data. This week I had Sharon go in and make them all not late. These are indeed your [purchase orders] but from last year—they were set up wrong. . . . The only way finance could fix these was by receiving these in. I will reforward the notifications to you. Again you do not have permission to change this data— which I see you have.

(*Id.*).

Rather than provide evidence on which a reasonable jury could conclude that Datacard's proffered reasons for Kitui's termination are pretextual, these emails show: (1) that Datacard corrected errors in the metrics, (2) Jasper consistently responded to Kitui's questions and concerns about the integrity of data with explanations regarding the accuracy of the metrics, and (3) Jasper continued to believe that Kitui was improperly changing the metrics. Significantly, Kitui conceded in her own deposition testimony that she did not "have any evidence" to support her assertion that she did not change the metrics "other than" her "word." (Kitui Dep. at 39). Kitui's conclusory, self-serving allegations and deposition testimony are insufficient to create a triable issue at the summary judgment stage. *See Loving*, 2013 WL 4734017, at *5 (concluding that plaintiff's evidence, consisting of self-serving allegations in declarations and grievances, was insufficient to support his claim and withstand a motion for summary judgment). In addition,

"the key question is not whether [Kitui] truly" failed to meet Datacard's performance metrics or truly manipulated metrics, "'but whether [Datacard] really believed' she did." *See Bailey*, 2005 WL 1869108, at *8 (quoting *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004)). The emails submitted by Kitui and other evidence of record does not provide sufficient evidence to allow a reasonable jury to conclude that Datacard did not believe that Kitui's performance was deficient or that Datacard did not believe that Kitui was manipulating the metrics. *See id.*; *see also* (Kitui Dep. at 53) (testifying that the only basis for her allegation that Jasper "knew" Kitui did not change the metrics is that Jasper "ha[d] access" to the metrics).

At the hearing on the Motion for Summary Judgment, Kitui argued that the performance evaluations Datacard submitted in support of their motion (*i.e.*, the 2012/2013 Evaluation and the 2013 Mid-Year Evaluation) were different than those that she received from Datacard and suggested that this demonstrates some improper behavior and/or effort to conceal discriminatory animus by Datacard.

During the hearing, Kitui submitted to the Court a copy of the 2012/2013 Evaluation in order to show these differences, which Kitui identified as follows: (1) in the version of the evaluation she previously received, her overall rating was "Achieving," while in the version submitted by Datacard her overall rating was "Achieving" with the number "3.00," and (2) in the version of the evaluation she previously received, the last page states, "Created By: Rebecca Jasper 10/03/2012 9:27:31AM," while in the version submitted by Datacard, the last page states "Created By: Rebecca Magistad" with no date- or time-stamp. Because Kitui was unable to locate her copy of the 2013 Mid-Year Evaluation at the hearing, the Court gave Kitui several days to file "the additional documents [Kitui] identified during the hearing, along with an explanation of why she believes those documents are different from the corresponding

documents" filed by Datacard. (Minute Entry Dated May 20, 2016). Kitui filed a copy of the 2013 Mid-Year Evaluation with the Court in a timely fashion, but did not provide any explanation as to the difference between the document she filed and the document Datacard filed, though it appears that the same type of discrepancies Kitui identified with respect to the 2012/2013 Evaluation exist with respect to the 2013 Mid-Year Evaluation. *Compare* (Ex. 3, Attached to Additional Exs. from May 20, 2016 Hr'g) [Doc. No. 91-1 at 3–6] *with* (2013 Mid-Year Evaluation).[20] None of the discrepancies that Kitui points to bear on the **substance** of the documents submitted to the Court. Without more than Kitui's speculation that these discrepancies suggest something nefarious and/or discriminatory, the Court concludes that the discrepancies do not create a genuine issue of material fact as to pretext.[21]

Finally, while Kitui appears to rely on her declaration to create genuine disputes of material fact as to pretext, her efforts are unavailing. To the extent Kitui's declaration contains allegations that are inconsistent with her own deposition testimony, her allegations cannot create a genuine fact dispute. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1362, 1365 (8th Cir. 1983) (reasoning that a party does not create genuine issues of fact by filing an affidavit that is inconsistent with previous deposition testimony when there are no circumstances that "suggest legitimate reasons for" the inconsistent affidavit); *compare, e.g.*, (Kitui Decl. ¶ 41) ("In May 2013 I received another good review, and was advised that I was achieving as expected.") *with*

---

[20]     Kitui also filed two other documents with the Court: an email dated February 11, 2014, from Kitui to Stockinger in which Kitui requested her personnel file and a document that Kitui identifies as a "Statement of Merit Increase from 2013." *See* (Additional Exs. from May 20, 2016 Hr'g) [Doc. No 91]; (Email, Ex. 1, Attached to Additional Exs. from May 20, 2016 Hr'g) [Doc. No 91-1 at 1]. The Court did not give Kitui permission to file these additional exhibits, nor has Kitui offered any explanation as to why she did not submit them earlier in conjunction with her response to the Motion for Summary Judgment. Kitui has also failed to provide any argument regarding these documents, and the Court therefore does not further address them.

[21]     For the same reason, the Court recommends that Kitui's oral motion to strike the relevant exhibits submitted by Datacard be denied.

(Kitui Dep. at 63–70, 73–75) (acknowledging that in the 2012/2013 Evaluation, Jasper identified several areas Kitui could "continue to improve and work on," and acknowledging that the expectation for on time delivery was "97 percent," meaning that she was "still somewhat late" and "not yet where [she] need[ed] to be"); *compare also* (Kitui Decl. ¶ 68) (suggesting that Kitui's work performance prior to the imposition of the 2014 PIP "had generated favorable reviews") *with* (Kitui Dep. at 99) ("Do you recall Ms. Jasper in the meeting she had with you in November 2013 telling you that you were not meeting her performance expectations? . . . Yes.").

In addition, Kitui's declaration contains allegations that primarily reflect Kitui's own view or interpretation of events, Kitui's unsubstantiated allegations, and/or Kitui's speculation. *See, e.g.*, (Kitui Decl. ¶¶ 2a–3a, 9, 11, 13–14, 22–23, 26–35, 38, 46, 53–54, 60, 62, 64–66, 68, 70, 73–75, 77–81, 83, 84). In this regard as well, Kitui's declaration does not create a triable issue of fact and is insufficient to allow Kitui's claims to withstand a motion for summary judgment. *See Gibson*, 670 F.3d at 855 (noting that plaintiff did "not present[] any evidence, other that her own allegations, to demonstrate that the warnings issued to her were not based in fact"); *Davenport*, 30 F.3d at 945 ("[P]laintiff maintains that similarly situated white employees committed the same infractions and yet were not discharged. While evidence supporting this claim would be highly relevant to the issue of pretext, plaintiff presented no such evidence other than his own unsubstantiated allegations in deposition."); *Loving*, 2013 WL 4734017, at *5 (concluding that plaintiff's "evidence, in the form of allegations made" in his own declaration "consist[ed] entirely of [his] own self-serving statements" and that such "bare allegations" were insufficient to permit plaintiff's "claims to survive a motion for summary judgment"). As to facts within Kitui's declaration that are consistent with other evidence before the Court and undisputed, they do not create a triable issue regarding whether Kitui was subjected to

discrimination. *See, e.g.*, (Kitui Decl. ¶¶ 1a, 4a, 1–5, 40, 42–45, 48–49, 55–57, 61, 63, 67, 69, 71–72, 76–77, 82, 85).[22]

For all the reasons stated above, the Court concludes that Kitui has failed to present sufficient evidence to permit a reasonable inference of discriminatory animus. The Court therefore concludes that Datacard is entitled to summary judgment with respect to Kitui's race discrimination claim.

### c.      Retaliation Claim

As noted above, when there is no direct evidence of retaliation, courts apply a *McDonnell Douglas* analysis to a plaintiff's retaliation claim. *Gibson*, 670 F.3d at 856. A plaintiff must first establish a prima facie case of retaliation. *Id.* "[I]f the plaintiff puts forth a prima facie case, the employer may rebut the resulting presumption of discrimination by articulating a legitimate, non-

---

[22]      The Court notes that any attempt by Kitui to create a triable issue regarding pretext based on disparate treatment of similarly-situated employees would fail. *See Gibson*, 670 F.3d at 854 (noting that a plaintiff may demonstrate pretext "among other ways, by showing that an employer . . . treated similarly-situated employees in a disparate manner"); (Compl. ¶¶ 11, 15) (alleging that Kitui was treated differently and less favorably than her white co-workers). There is no record evidence that would allow a reasonable jury to conclude that Kitui was treated differently from similarly-situated employees. *See, e.g.*, (Kitui Dep. at 29–32) (stating that she did not have any evidence that she was paid less than white co-workers who held a similar job and that she could not offer any specific names of employees she believed were paid more than she was); (*id.* at 38–39) (stating that the basis of her allegation that she was disciplined for errors of her white co-workers was "the allegation made by Rebecca Jasper" that Kitui "changed [the] metrics," but stating that she did not have any evidence other than her "word" to support her assertion that she did not change the metrics); (*id.* at 39–40) (stating that she was treated more harshly than her white co-workers because she was terminated, but providing no information regarding the white co-workers she was referring to); (*id.* at 40–41) (noting that she believes she was not given credit for achievements in the manner that white co-workers were and that she was marginalized or ignored, but providing a single example when she was not recognized for an achievement while members of her team were given verbal accolades); (*id.* at 44–45) (stating that she was marginalized when metrics were inaccurate and required correction, but conceding that correction of the metrics was required "across the board" as to all buyers); (*id.* at 47) (stating that she believed other buyers were substantially underperforming but were not terminated, but conceding that she did not know whether any other buyer was placed on a PIP or terminated for poor metrics).

retaliatory reason for the adverse employment action. Finally, if the employer proffers a race-neutral rationale, the plaintiff may attempt to refute the asserted reason as mere pretext." *Id.* at 856–57 (alteration in original) (internal quotation marks omitted).

Kitui asserts that her termination was retaliation for her request for her personnel file and for her statements and actions regarding the Stenzel incident. *See* (Mem. in Opp'n at 1) ("Plaintiff was terminated a short time after she complained of racism to corporate counsel, and immediately after she asked for her file.").

As with Kitui's race discrimination claim, the Court again assumes for the purposes of analysis that Kitui has established a prima facie case. *See Smith*, 2016 WL 3726032, at *3; *Gibson*, 670 F.3d at 854. For the same reasons discussed above, however, Datacard has satisfied its burden to articulate a legitimate, non-retaliatory reason for Kitui's termination—namely, her deficient work performance and her manipulation of her performance metrics. *See supra* Part III.B.1.b.i. Likewise, for the reasons explained above, Kitui "has not proffered a triable issue" regarding whether her termination was pretextual. *Askari v. L.A. Fitness Int'l, LLC*, Civil No. 09-2789 (ADM/JSM), 2010 WL 3938320, at *7 (D. Minn. Oct. 5, 2010) (Montgomery, J.); *see also Fiero*, 759 F.3d at 880 ("With respect to her retaliation claim, Fiero relies on the same arguments for pretext that she made with respect to her . . . discrimination claim. As we have explained, Fiero has failed to create a question of fact as to whether CSG's legitimate, nondiscriminatory reason for her discharge was pretextual."). In addition to the issues discussed above, to the extent Kitui asserts that the temporal proximity between her request for her personnel file and/or her actions regarding the Stenzel incident and her termination demonstrates pretext, her argument is unavailing. *See Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (noting that "proximity alone is insufficient to establish pretext" and that courts consider the "timing of the discharge . . .

in light of other evidence, or lack of evidence, in the record) (omission in original) (internal quotation marks omitted). Datacard's concerns regarding Kitui's job performance arose well before both Kitui's request for her personnel file and Kitui's statements to general counsel or her other actions related to the incident with Stenzel. *See, e.g.*, (2012/2013 Evaluation at 7); (Kitui Dep. at 63–70, 73–75); (Exs. 3–5, 7–8, Attached to Jasper Decl.); (2013 Mid-Year Evaluation at 20–22). "The consistency with which" Kitui's supervisor "expressed and documented [her] concerns [regarding Kitui's job performance]—both before and after [Kitui's alleged] protected activity—bolsters, rather than rebuts" Datacard's "stated reason for termination." *See Sieden v. Chipotle Mexican Grill, Inc.*, 128 F. Supp. 3d 1133, 1138 (D. Minn. 2015) (Ericksen, J.). The Court therefore concludes that Datacard is entitled to summary judgment on Kitui's retaliation claim.

### d.    Racial Harassment Claim[23]

As noted, Kitui also asserts a racial harassment claim. To prevail on a racial harassment hostile work environment claim, Kitui must prove that: (1) she was a member of a protected group; (2) she "was the target of severe or pervasive harassment on account of [her] race"; (3) "the harassment affected a term, condition, or privilege of [her] employment"; and (4) her employer "knew or should have known of the racial harassment and failed to take adequate remedial measures." *Sallis*, 408 F.3d at 476; *Woodland*, 302 F.3d at 843. Datacard contends that it is entitled to summary judgment on this claim, arguing that there are no genuine issues of material fact regarding Kitui's failure to demonstrate that she was subject to harassment, that any

---

[23]    Kitui's opposition to the Motion for Summary Judgment does not address Datacard's arguments as to her racial harassment claim. *See generally* (Mem. in Opp'n). As noted by Datacard, "failure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009); *see also* (Datacard's Reply in Supp. of Mot. for Summ. J.) [Doc. No. 86 at 4 n.4]. In light of Kitui's pro se status and in an abundance of caution, the Court makes a recommendation as to this claim.

harassment was based on her membership in a protected group, that any harassment affected a term, condition, or privilege of her employment, and that Datacard knew or should have known of racial harassment and failed to take remedial action. (Mem. in Supp. at 27–30).

Even viewing the evidence in a light most favorable to Kitui, the Court concludes that no reasonable jury could find that she was subject to harassment due to her race or that she was subject to racial harassment that created an objectively hostile or abusive work environment. *See Woodland*, 302 F.3d at 844. Kitui's claim of racial harassment appears to stem from her interactions with Boucher, Jasper, and Stenzel. *See* (Kitui Dep. at 49–55) (discussing interactions with Boucher and Jasper that Kitui believed were harassing); (*id* at 57–59, 142–62) (discussing Stenzel incident). No interaction that Kitui had with Boucher, Jasper, or Stenzel involved a statement or other conduct by Boucher, Jasper, or Stenzel that was explicitly racist, nor do their statements or conduct objectively imply any racial hostility. *See* (Kitui Dep. at 50) ("And you attribute your belief that [Boucher] didn't like you to your skin color? . . . I don't know."); (*id.* at 54) (alleging that Jasper harassed Kitui because she accused her of changing her metrics, placed her on a PIP, and failed to place her on a PIP at an earlier point in time); (*id.* at 150–53) (stating that Stenzel's communication to her "just d[id]" have "racial overtones" from Kitui's "point of view" and that Stenzel's email to Jasper did not "on the surface" have racial overtones but that from her "view" and in her "opinion" the email had racial overtones and was sent to Jasper because Kitui is black); (*id.* at 162) (stating she has no evidence that Stenzel's conduct was racially motivated). Indeed, considering the alleged "instances of discrimination as the alleged instances of harassment, . . . these actions and comments comprised criticism rather than harassment." *Hannoon*, 324 F.3d at 1048. Furthermore, for similar reasons, the record does not present a triable issue of fact regarding whether any alleged harassment was on account of

Kitui's race. *See id.* (affirming grant of summary judgment where there was no evidence of "the requisite causal nexus" between the alleged incidents and race).

In addition, a "hostile work environment is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment as viewed objectively by a reasonable person." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) (internal quotation marks omitted). While Kitui subjectively viewed the above-discussed interactions as racially hostile, her subjective views alone are insufficient to establish a hostile work environment claim. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) ("To be actionable under Title VII, the work environment must have been both objectively and subjectively offensive."). Moreover, the incidents that are the basis for Kitui's racial harassment claim are relatively few. These "isolated sporadic incidents will not suffice" for purposes of a hostile work environment claim. *Carpenter*, 481 F.3d at 618; *see also Bainbridge*, 378 F.3d at 759–60 (concluding that plaintiff's co-workers use of "racial slurs did not render the work environment . . . objectively hostile" when the "remarks were . . . sporadic," occurring approximately once per month).

Under these circumstances, the evidence falls well-short of the type of evidence required in the Eighth Circuit to avoid summary judgment on a hostile work environment claim of racial harassment. *See Woodland*, 302 F.3d at 844 (finding that employer was entitled to summary judgment because the "sporadic racially motivated misconduct of . . . co-workers" was not sufficiently severe or pervasive); *Bainbridge*, 378 F.3d at 759 (noting that courts consider "all the circumstances" to determine whether a "reasonable person would find [the work environment] hostile or abusive," including the frequency and severity of the discriminatory

conduct, "whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance"). The Court therefore concludes that Datacard is entitled to summary judgment on Kitui's hostile work environment claim.

### e.   Conclusion[24]

For the above stated reasons, the Court concludes that Datacard is entitled to summary judgment on Kitui's race discrimination, retaliation, and racial harassment claims. Specifially, with respect to Kitui's race discrimination and retaliation claims, the Court concludes that, even assuming Kitui has established a prima facie case under the applicable *McDonnell Douglas* framework, Datacard has satisfied its burden of articulating a legitimate, non-discriminatory and non-retaliatory reason for her termination, and Kitui has failed to present sufficient evidence to create a genuine issue of material fact regarding whether Datacard's articulated reason for her termination was pretextual. With respect to Kitui's racial harassment claim, the Court concludes that no reasonable jury could find that Kitui was subject to harassment due to her race or that she was subject to racial harassment that created an objectively hostile or abusive work environment. The Court therefore recommends that Datacard's Motion for Summary Judgment be granted. In

---

[24]   The Court notes that at the close of Kitui's Memorandum in Opposition, Kitui refers to the distinction between "mixed motive" and "pretext" approaches to "proving Title VII disparate treatment violations" and cites case law for the proposition that protected employee conduct includes "informal complaints at the workplace" and "formal employee charges or testimony in the legal civil realm" and  for the proposition that "unlawful retaliation" is not confined to harms at the workplace and may "consist of an employer filing false criminal charges against a former employee." (Mem. in Opp'n at 12). Finally, Kitui discusses the genesis of the disparate impact theory of discrimination under Title VII. (*Id.* at 12–13). Kitui does not provide any argument regarding which of these legal principles she believes apply to her case, and Kitui does not cite to any record evidence or apply any of the cited legal principles to the facts of this case. To the extent Kitui seeks to invoke a legal principle or framework not already addressed herein, her efforts are insufficient.

addition, for the reasons previously discussed, the Court recommends that Kitui's oral motion to strike certain Datacard exhibits be denied.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Entrust Datacard Corporation's Motion for Summary Judgment [Doc. No. 52] be **GRANTED**;

2.    Plaintiff Janet Kitui's oral motion to strike exhibits, made on the record at the May 20, 2016 hearing, be **DENIED**; and

3.    This action be **DISMISSED with prejudice**.


Dated: July 29, 2016


                                          _s/Steven E. Rau_____
                                          STEVEN E. RAU
                                          United States Magistrate Judge




**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.